# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARY LYN DANIELAK,

     Petitioner,

v.                                     Case No. 14-11131

MILLICENT WARREN,

     Respondent.

_____/

## OPINION AND ORDER
### DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Habeas petitioner Mary Lyn Danielak has filed a *pro se* application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges the following state convictions: delivery of a controlled substance, causing death, Mich. Comp. Laws § 750.317a; common-law obstruction of justice, Mich. Comp. Laws § 750.505; tampering with evidence, Mich. Comp. Laws § 750.483a(5)(a); and removing a body without the medical examiner's permission, Mich. Comp. Laws § 52.204. Petitioner alleges as grounds for relief that the evidence at trial was insufficient, her right to due process was violated by the State legislature's creation of a strict liability crime that carries the same penalty as murder, and the trial court violated her right to present a defense by excluding certain evidence. The State argues in a response to the petition that Petitioner is not entitled to relief and that the court should deny the petition. The court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

# I.  BACKGROUND

The charges against Petitioner arose from the death of nineteen-year-old Cherie

(or Sherry) Irving ("the victim").  Petitioner was tried jointly with her boyfriend, Randy

Reeser ("Reeser"), and Reeser's mother, Anna Marie Rand ("Rand"), in Jackson County

Circuit Court.  The evidence at trial established that,

> [i]n the early morning hours of October 3, 2010, the victim drove to
> Danielak's apartment in Jackson, Michigan.  Danielak and the victim then
> went to the Abbey Villa Apartments to meet a drug dealer named "Chill."
> Sergeant Brian Russell testified that Danielak told him that she had
> purchased cocaine and heroin from Chill in the past, and that she was
> going to introduce the victim to Chill so the victim could purchase heroin in
> the future if needed.  Danielak purchased three bindles of heroin from Chill
> and the victim purchased four bindles.  Danielak and the victim went back
> to Danielak's apartment and used a syringe to inject themselves with
> heroin.
>
> Danielak woke up late in the afternoon of October 3, 2010, and
> found the victim dead on the bathroom floor.  On discovering the victim's
> body, Danielak called her boyfriend, Randy Reeser.  According to
> Danielak, Reeser told her to go to his mother's house (Rand's house), get
> ready for work, and that he would take care of it.  Danielak did as Reeser
> instructed and went to work at approximately 9:00 p.m.
>
> Later that evening, Reeser went to Rand's house and informed her
> that there was a dead body in Danielak's apartment.  Reeser and Rand
> drove to Danielak's apartment and placed the victim's body in the back
> seat of Rand's car.  Later, Reeser and Rand moved the body to the trunk
> and drove to the Sandstone Creek Bridge. Rand parked on the side of the
> road and Reeser removed the victim's body from the trunk.  Reeser
> placed the victim's body on the side of road, but it later slipped down an
> embankment and fell into the creek.

*People v. Danielak*, No. 305491, 2012 WL 6913789, at *1 (Mich. Ct. App. Nov. 20,

2012) (footnotes omitted).

On October 5, 2010, the victim's father reported the victim as missing, and on

October 6, 2010, a fisherman found the victim's body submerged in Sandstone Creek.

The police were notified, and a detective determined that the body matched a picture he

had received of the missing victim.  As a result of a tip, the police located and arrested Petitioner and Reeser on October 7, 2010.

During an interview with the police, Petitioner explained how she and the victim had purchased heroin from Chill and injected the heroin with a needle at Petitioner's apartment.  Petitioner admitted during the interview that she had sent text messages to the victim on October 3 and October 4 to cover up what had happened.  Petitioner also admitted to the police that she may have caused the victim's death by introducing the victim to Chill and facilitating the drug deal.  Following the interview, Petitioner informed an officer that Rand had helped move the body.

The police interviewed Reeser, who initially denied any involvement in the crimes.  However, when confronted with Petitioner's statements to the police, Reeser admitted that he had removed the body from the apartment, taken it to the Sandstone Creek Bridge, and placed the body on the side of the road so that somebody would find it.

The police subsequently contacted Rand, who ultimately informed the police that, a couple of days earlier, her son Randy Reeser had called her and said that a female had passed away on his bathroom floor and that he needed help with removing the body from his apartment.  She and Reeser then drove to Reeser's apartment and placed the body in the back seat of her car.  They returned to her apartment and put the body in the truck of her car.  Later that day, the two of them drove out to a creek where Reeser removed the body from the trunk of the car and placed it alongside the road.

Dr. Patrick Cho performed the autopsy on the victim.  He testified that the cause of death was drug abuse or drug overdose and that the manner of death was indeterminable.  He explained that toxic amounts of both cocaine and heroin were

present in the victim's body and that either drug by itself or in combination would have caused the victim's death. He could not say which of the two drugs actually killed the victim.

The prosecutor's theory was that Petitioner aided and abetted Chill, the drug dealer, in delivering the heroin to the victim by bringing the victim to Chill to make the drug transaction. The prosecutor maintained that Petitioner aided and abetted Reeser and Rand in committing the other three crimes because she knew what Reeser and Rand intended to do and did nothing to stop it.

None of the three defendants testified or presented any witnesses. Petitioner did not dispute the facts. Her theory was that she did not commit a crime because she did not cause the victim's death and because she did nothing to aid Reeser or Rand in committing the three crimes involving the body.

The trial court did not instruct the jury on any lesser-included offenses, and on May 23, 2011, the jury found Petitioner guilty, as charged. On July 21, 2011, the trial court sentenced Petitioner to concurrent terms of ten to twenty years in prison for delivering a controlled substance, causing death; three to five years in prison for obstructing justice; two to four years in prison for tampering with evidence; and one year in jail or prison for removing a body without notifying the medical examiner.

Petitioner raised her habeas claims in a direct appeal from her convictions. The Michigan Court of Appeals affirmed her convictions, *see Danielak*, 2012 WL 6913789, and on May 22, 2013, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the questions presented to it. *See People v. Danielak*, 830 N.W.2d 139 (Mich. 2013.)

4

On March 17, 2014, Petitioner filed her habeas corpus petition. Her grounds for relief are: (1) the evidence at trial was not sufficient to support her convictions for obstruction of justice, tampering with evidence, and removing a dead body; (2) the state legislature's creation of a strict liability crime that carries the same penalty as murder violates her right to due process; (3) there was insufficient evidence to sustain her conviction for delivery of a controlled substance, causing death; and (4) the trial court deprived her of a fair trial and the right to present a defense by refusing to permit her to admit in evidence comments made by the deceased victim's husband.

## II. STANDARD

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application"

5

> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.

## III.  DISCUSSION

### A. Habeus Corpus Relief

6

## 1.  Sufficiency of the Evidence

The first and third habeas claims challenge the sufficiency of the evidence at Petitioner's trial.  The Michigan Court of Appeals concluded on review of these claims that there was sufficient evidence to sustain Petitioner's convictions.

### a.  Clearly Established Federal Law

The Supreme Court has held that "the Due Process Clause [of the Fourteenth Amendment to the United States Constitution] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The relevant question on review of a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.*

> *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam).  And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

7

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (*per curiam*).

### b.  Application

### i. Obstruction of Justice, Tampering with Evidence, and Removing a Dead Body

Petitioner alleges that the prosecutor failed to produce sufficient evidence at trial to support her convictions for obstruction of justice, tampering with evidence, and removing a dead body.  She states that her convictions for these three crimes rest on the false premise that she aided and abetted Reeser and Rand in moving and disposing of the victim's body.  She points out that she was not present when the victim's body was moved, and she claims that she did not know Reeser and Rand possessed the illegal intent to move the body.  As to all three counts, Petitioner alleges that the lack of any evidence that she aided and abetted Reeser and Rand or knew what they intended to do is fatal and there is no need to go any further in examining the counts.

In, Michigan,

"[a]iding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . .  To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.  An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

*People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999) (quoting *People v. Turner*, 540 N.W.2d 728, 733-34 (Mich. Ct. App. 1995)).

The evidence at trial established that Petitioner discovered the victim's body in the bathroom of her apartment about 4:30 p.m. on Sunday, October 3, 2010. She became upset, woke up Reeser, who was sleeping in the apartment, and told him "what was going on." Reeser instructed Petitioner to go to work and said that he "would take care of it." About 7:00 p.m., however, Petitioner was observed going through personal property in the victim's vehicle, which was parked in Petitioner's driveway. At some point, Petitioner went to Rand's apartment to shower. She arrived at her job at 9:00 p.m. She sent text messages to the victim to cover up what had happened and to make it appear that she did not know the victim was dead. (Dkt. # 11-7, Pg ID 721-24; Dkt. # 11-8, Pg ID 844-47, 878, 882.)

Petitioner informed Rand that she (Petitioner) had told the police she did not know anything about it. Rand responded to Petitioner that she hoped the police found the body so that the family could have closure. (Dkt. # 11-8, Pg ID 795-96, 815.) Both Reeser and Rand admitted to the police that they moved the victim's body and left it on the roadside. The police found no evidence of drugs or drug paraphernalia in Petitioner's apartment when they searched it on October 6, 2010 (*id.* at Pg ID 833-34), and, at no point did Petitioner call the police or medical examiner to report the death.

At a minimum, the evidence established that Petitioner tried to cover up evidence and the fact that the victim died in her apartment. The jury could have inferred from this evidence that Petitioner sought help from Reeser, and possibly Rand, and that she knew at least Reeser intended to move or dispose of the body. Reeser apparently did

9

not inform Petitioner that he would call the police.  Instead, according to Petitioner, he promised to "take care of it."  The implication was that he would do something with the body.

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner aided and abetted Reeser and Rand in obstructing justice, tampering with evidence, and removing or disposing of a dead body. Thus, the evidence was sufficient to convict Petitioner of those crimes.

The Michigan Court of Appeals, moreover, determined that the prosecutor carried his burden of proving each of the three counts.  Regarding common-law obstruction of justice, the Court of Appeals noted that the victim died under circumstances that required an inquest into the cause and manner of death and that the object of the crime was to prevent or delay an inquest into the cause of death.  The Court of Appeals accordingly rejected Petitioner's challenge to the sufficiency of the evidence supporting the obstruction-of-justice charge.

As for the charge of tampering with evidence, the Court of Appeals stated that the removal and concealment of the victim's body interfered with a future official proceeding (the criminal trial) and, therefore, sufficient evidence was presented to find Petitioner guilty of that charge on an aiding and abetting theory.  For similar reasons, the Court of Appeals concluded that there was sufficient evidence to support the jury's verdict on the charge of removing a body without the medical examiner's permission.

The "state court's interpretation of state law . . . binds a federal court sitting in habeas corpus," *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), and because the state court's decision on the federal due process claim was objectively reasonable, this court

10

must defer to that decision.  Although it may be a close issue, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable," *Richter*, 562 U.S. at 102, and the court may not overturn the state appellate court's decision simply because the court disagrees with the state court.  *Coleman*, 132 S. Ct. at 2062. The court therefore declines to grant habeas relief on Petitioner's first claim regarding the sufficiency of the evidence to support her convictions for obstruction of justice, tampering with evidence, and removing a body without permission.

### ii.  Delivery of a Controlled Substance

Petitioner claims that there was insufficient evidence to support her conviction for delivering a controlled substance, causing death, because (1) she did not aid and abet the delivery of heroin and (2) the prosecution did not prove that she caused the victim's death.  In support of this claim, Petitioner alleges that the victim ingested a lethal dose of cocaine earlier in the day and that Petitioner had no reason to believe that the victim's purchase of three bags of heroin would be lethal.  Thus, according to Petitioner, she was not responsible for the victim's death.

The Michigan Court of Court of Appeals found Petitioner's causation argument unpersuasive.  The Court of Appeals also determined that there was sufficient evidence to convict Petitioner of delivery of a controlled substance, causing death, under an aiding and abetting theory.

The evidence at trial established that Petitioner took the victim to a location where Chill, the drug dealer, could be found.  She introduced the victim to Chill, who sold them heroin.  Although Petitioner claims that the victim paid for her own heroin, she

11

facilitated the transaction by taking the victim to Chill and introducing the two of them.

In fact, she admitted during her interview with Sergeant Brian Russell that she may

have caused the victim's death by introducing her to Chill.  (Dkt. # 11-8, Pg ID 847,

884.)

Petitioner relies on the Supreme Court's decision in *Burrage v. United States*,

134 S.Ct. 881 (2014), as support for her contention that she did not cause the victim's

death.  The facts in *Burrage* indicate that a drug addict named Joshua Banka died after

an extended drug binge which included the use of heroin purchased from Marcus

Burrage.  Burrage was convicted of distributing heroin to Banka the day before Banka

died even though two medical experts testified at trial that they could not say whether

Banka would have lived if he had not taken the heroin.  The trial court sentenced

Burrage to a mandatory minimum sentence of twenty years in prison under 21 U.S.C. §

841(b)(1)(C).

The Supreme Court ruled that the penalty provision of § 841(b)(1)(C) does not

apply when the defendant's act or omission was merely a substantial or contributing

factor in a victim's death.  Rather, the defendant's conduct must have been the actual

cause of the death, and because neither of the medical experts could say whether the

heroin caused Banka's death, the Supreme Court reversed Burrage's conviction for

distributing heroin to Banka shortly before his death.  The Supreme Court held "that, at

least where use of the drug distributed by the defendant is not an independently

sufficient cause of the victim's death or serious bodily injury, a defendant cannot be

liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such

use is a but-for cause of the death or injury."  *Burrage*, 134 S. Ct. at 892.

12

*Burrage* is not controlling here.  First, the Supreme Court was interpreting the penalty enhancement provision of a federal statute, not the Michigan statute in question here.  Second, the Supreme Court decided *Burrage* after Petitioner's conviction became final.  It was not "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)(1), and "several courts have already found that *Burrage* did not announce a new rule of constitutional law and that, even if it had, the Supreme Court did not make *Burrage* retroactively applicable."  *Stewart v. United States*, 89 F. Supp. 3d 993, 996 (E.D. Wis. 2015).

Finally, the Supreme Court acknowledged in *Burrage* a possible exception to strict "but for" causality "when multiple sufficient causes independently, but concurrently, produce a result."  *Burrage*, 134 S. Ct. at 890.  Dr. Cho testified at Petitioner's trial that the victim had lethal amounts of both cocaine and heroin in her body, that the amount of either drug was enough to kill her, and that he could not say which drug actually killed her.  He explained that the heroin independently would have killed the victim even if she had not taken cocaine and that either one of the drugs or both of them combined could have caused the death.  (Dkt. # 11-7, Pg ID 764-54, 660-62, 674-77.)

Because Dr. Cho testified that the victim would have died from the heroin use alone, *Burrage* is not controlling.  Multiple sufficient causes independently, but concurrently, caused the victim's death, unlike the situation in *Burrage* where it could not be determined whether the heroin was the actual cause of death.

Furthermore, Dr. Cho testified that he found evidence of pulmonary edema (fluid in the lungs), when he conducted the autopsy.  He claimed that the fluid was consistent with the use of heroin because heroin depresses the central nervous system and affects

13

one's ability to breathe.   In contrast, cocaine is a stimulant, which he said is toxic to the heart and can cause the heart to stop beating.  He found no evidence of heart disease. (*Id.* at Pg ID 643, 663-66.)

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner aided and abetted Chill in delivering heroin to the victim and that the heroin caused the victim's death.  Therefore, the evidence was sufficient to convict Petitioner of delivering a controlled substance, causing death, and the state court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Jackson*.  The court denies relief on Petitioner's third claim.

## 2. Strict Liability

Petitioner alleges next that her conviction for delivering a controlled substance, causing death, violates due process because the Michigan legislature created a strict liability crime when it enacted Mich. Comp. Laws § 750.317a, and the penalty for the crime is the same penalty as the one for second-degree murder. The statute reads:

A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of section 7401 of the public health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

Mich. Comp. Laws § 750.317a.

Petitioner argues that she should not be held strictly liable for the victim's death because the victim caused her own death through an overdose of cocaine and heroin.[1]

---

[1] In support of this argument, Petitioner alleges that:  the victim injected high levels of cocaine before contacting Petitioner, and it was the combination of heroin and cocaine that caused the victim's death; it was the victim, not Petitioner, who wanted to buy heroin on the night in question; Petitioner was unaware that the victim was upset and suicidal at the time; the victim bought her own heroin, paid for it herself, received it

14

Petitioner also claims that § 750.317a is unconstitutional because the penalty for the crime is the same as the penalty for second-degree murder even though the statute does not require a finding of malice, as does second-degree murder.  Petitioner asserts that getting in a vehicle with the victim and purchasing heroin with her is not the equivalent of murder.  The Michigan Court of Appeals disagreed with Petitioner's arguments and determined that § 750.317a is constitutional.

"Strict liability offenses are generally disfavored," *United States v. Parks*, 411 F. Supp. 2d 846, 854 (S.D. Ohio 2005) (citing *Morissette v. United States*, 342 U.S. 246, 265 (1952)), but they "are not necessarily unconstitutional."  *Stepniewski v. Gagnon*, 732 F.2d 567, 570 (7th Cir. 1984).  In fact, the Supreme Court has refused to say

> that:  " 'a vicious will' is necessary to constitute a crime, for conduct alone without regard to the intent of the doer is often sufficient.  There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."

*Lambert v. California*, 355 U.S. 225, 228 (1957) *(*internal citations omitted).

Furthermore, "[a] state's decisions regarding which actions or activities will give rise to strict criminal liability rest within that state's sound legislative discretion," *Stepniewski*, 732 F.2d at 571,[2] and the Michigan Supreme Court has determined that   § 750.317a is a general intent crime, which requires the intent to deliver a schedule 1 or 2 controlled substance.  *People v. Plunkett*, 780 N.W.2d 280, 285 (Mich. 2010).  Because § 750.317a is a general intent crime, it is not a strict liability offense.

---

directly from the dealer, and injected it herself; and Petitioner checked on the victim later that night and determined that she was alright.

[2]  *See also Sanford v. Yukins*, 288 F.3d 855, 862 (6th Cir. 2002) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 103 (7th Cir. 1991), for principle that, whether a given element of a crime is necessary is a question of state law).

15

Even if § 750.317a were a strict liability crime, "the Supreme Court has recognized the propriety of strict liability without any element of scienter in statutes that are 'regulatory' in nature or designed to protect the 'public welfare.'" *Karlin v. Foust*, 188 F.3d 446, 476 (7th Cir. 1999) (citing *Morissette*, 342 U.S. at 255–60).  And the Michigan Court of Appeals determined in Petitioner's case that the purpose of § 750.317a is to protect the public from dangerous controlled substances.  The statute therefore is constitutional, and habeas relief is not warranted.

### 3. Excluded Evidence

Petitioner's fourth and final claim alleges that the state trial court deprived her of a fair trial and her right to present a defense by refusing to admit in evidence comments that the victim's husband (Darrell Irving) made to the police.  Mr. Irving informed the police that his wife had a history of using cocaine.  Petitioner asserts that the prosecutor opened the door to this evidence by eliciting Dr. Cho's testimony about naive drug users.  Petitioner claims that she should have been permitted to (1) rebut the implication that the victim was a naive drug user and (2) show that she did not introduce the victim to drugs.

### a. Clearly Established Federal Law

A defendant in a criminal prosecution is entitled to "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), but the Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane v.*

16

*Kentucky*, 476 U.S. 683, 690 (1986) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302

(1973)).  As explained in *United States v. Scheffer*, 523 U.S. 303 (1998),

> [a] defendant's right to present relevant evidence is . . . subject to
> reasonable restrictions.   A defendant's interest in presenting such
> evidence may thus "'bow to accommodate other legitimate interests in the
> criminal trial process.'"  As a result, state and federal rulemakers have
> broad latitude under the Constitution to establish rules excluding evidence
> from criminal trials.  Such rules do not abridge an accused's right to
> present a defense so long as they are not "arbitrary" or "disproportionate
> to the purposes they are designed to serve."  Moreover, [the Supreme
> Court has] found the exclusion of evidence to be unconstitutionally
> arbitrary or disproportionate only where it has infringed upon a weighty
> interest of the accused.

*Id.* at 308 (internal and end citations and footnote omitted).

Trial judges may "exclude evidence if its probative value is outweighed by certain

other factors such as unfair prejudice, confusion of the issues, or potential to mislead

the jury."  *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).  And a federal habeas

"court's duty 'is not to determine whether the exclusion of the evidence by the trial judge

was correct or incorrect under state law, but rather whether such exclusion rendered

petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional

rights.'"  *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v.*

*Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

**b.  The State-Court Rulings**

Petitioner's claim arose during trial.  As explained by the Michigan Court of

Appeals,

> [i]n a separate record, Detective Brett Stiles stated that [Mr.] Irving
> indicated during an interview that the victim had a large cocaine habit.
> Irving said that the victim took all the money out of their bank account and
> used it for cocaine.  Irving also stated that the victim would do whatever
> she needed to do to get her drugs.

17

*Danielak*, 2012 WL 6913789, at *9; *see also* 5/19/11 Trial Tr., at 5-19, 150, Dkt. # 11-8,

Pg ID 760-774, 905; 5/20/11 Trial Tr., at 25-29, Dkt. # 11-9, Pg ID 933-37.

Defense counsel attempted to subpoena Mr. Irving for trial, but there were

outstanding misdemeanor warrants for Irving's arrest, and the police were unable to

locate him or to serve him with a subpoena to testify at Petitioner's trial.  Consequently,

defense counsel sought permission to ask Detective Stiles about Mr. Irving's

statements.  The trial court ruled that defense counsel could not introduce Irving's prior

statements through Detective Stiles because the statements were hearsay and because

Petitioner was not precluded from presenting her defense through other means.  (Dkt. #

11-9, Pg ID 936-37.)

The Michigan Court of Appeals agreed that Mr. Irving's statements were

inadmissible hearsay.  The Court of Appeals also stated that Petitioner had abandoned

the right to argue that the evidentiary rule was arbitrary or disproportionate to the

purposes it was designed to serve.  Finally, the Court of Appeals stated that Petitioner

was not denied her right to present a defense, because Mr. Irving's statements were not

necessary to the defense that the victim had lethal amounts of cocaine in her system.

The Court of Appeals also opined that Mr. Irving's statements likely would have been

harmful to the defense, because

> [t]he medical examiner testified that a "naïve" drug user is a first time or
> infrequent drug user, meaning "that their body is naïve to the ... effects" of
> the drug.  The medical examiner further stated that a naïve drug user
> would be more susceptible to a drug overdose.  Evidence that the victim
> had a large cocaine habit would tend to indicate that she was not a naïve
> cocaine user, therefore making it more likely that the heroin, not the
> cocaine, killed her.

18

*Danielak*, 2012 WL 6913789, at *10.

### c. Application

Mr. Irving's statements to Detective Stiles were hearsay, which is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Mich. R. Evid. 801(c).  Hearsay generally is not admissible at trial, Mich. R. Evid. 802, and even though defense counsel argued that the hearsay was admissible under the "excited utterance" exception to the rule, the trial court implicitly rejected that argument.  "To the extent that any testimony and comments violated Michigan's rules of evidence, such errors are not cognizable on federal habeas review," *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009), because "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Furthermore, the purpose of hearsay rules is to ensure the reliability of evidence and an opportunity for the adversary to cross-examine the absent declarant.  *United States v. Winters*, 33 F.3d 720, 723 (6th Cir. 1994) (quoting *United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986) (citing *Anderson v. United States*, 417 U.S. 211, 219 (1974)).  Thus, enforcement of the hearsay rule in this case served a legitimate interest and was not arbitrary, nor disproportionate to the purpose it was designed to serve.

Even if the hearsay rule infringed on Petitioner's right to present a defense, the right to present a defense is subject to harmless-error analysis.  *See Fleming v. Metrish*,

19

556 F.3d 520, 536 (6th Cir. 2009).  On habeas review, a constitutional error is harmless

unless the error had a "substantial and injurious effect or influence in determining the

jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v.*

*United States*, 328 U.S. 750, 776 (1946).  The *Brecht* standard "whether or not the state

appellate court recognized the error and reviewed it for harmlessness . . . ."  *Fry v.*

*Pliler*, 551 U.S. 112, 121-22 (2007).

At Petitioner's trial, there was other evidence that the victim had used cocaine.

The victim's friend and co-worker, Heidi Cain, testified that the victim was using cocaine

with Petitioner before the victim left their workplace on the night of the victim's death.

Cain drove the victim home because the victim was not in the right state of mind to

drive.  It appeared to Cain that the victim then tried to get more cocaine.  (Dkt. # 11-7,

Pg ID 716–17, 740-43, 748-49.)

Furthermore, as the Michigan Court of Appeals recognized, and as noted above,

Mr. Irving's comments about the victim's cocaine habit could have harmed Petitioner

more than helped her.  If the victim were a chronic user of cocaine, as petitioner wanted

to show, the victim's body would have adjusted to cocaine and have been more

susceptible to heroin, making it appear more likely that the victim died from the heroin

that Petitioner helped her buy.  Such testimony would have been harmful to Petitioner's

defense, not helpful.

The Court concludes that Petitioner's right to present a defense was not violated

by the exclusion of Mr. Irving's statements, and even if it were, the error could not have

had a substantial and injurious effect or influence on the jury's verdict and was

20

harmless.  Habeas relief is not warranted on Petitioner's claim.

## B.  CERTIFICATE OF APPEALABILITY

Petitioner may not appeal the denial of this court's decision denying her habeas petition unless a district or circuit judge issues a certificate of appealability.  28 U.S.C.  § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484.

Reasonable jurists could debate the court's assessment of Petitioner's first claim regarding the sufficiency of the evidence supporting Petitioner's convictions for obstructing justice, interfering with evidence, and removing a body without permission. At a minimum, reasonable jurists could conclude that those issues are adequate to deserve encouragement to proceed further.  The court therefore will grant a certificate of appealability on claim one.  The court declines to grant a certificate of appealability on claims two, three, and four, because reasonable jurists could not find the court's

assessment of those claims debatable or wrong.

## IV.  CONCLUSION

IT IS ORDERED that the petition for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that a certificate of appealability is GRANTED as to

claim one and DENIED as to claims two, three, and four.

IT IS FURTHER ORDERED that Petitioner may proceed *in forma pauperis* on

appeal, because an appeal could be taken in good faith.  28 U.S.C. s 1915(a)(3).


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 25, 2016

 hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, July 25, 2016, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JAH\Habeus\14-11131.DANIELAK.deny.habeas.grant.cert.app.jah2.wpd